Good morning once again. I'm back with 20 minutes on about 18 issues. I'll try to move quickly here. Let me start with count 2, wire fraud. In connection with that, we suggest we use support by insufficient evidence. It would be very helpful to me if, rather than using just the shorthand wire fraud, if we could link the labels to the conduct. Because your case is really about relationships of charges and time, as I understand it. Well, the government alleged a scheme of fraud by Mr. Lichtenberg, who sits the front lawyer on Kauai, of the woman who had contacted him in order to conduct a real estate transaction and make sure that she got paid. And they charged both mail fraud and wire fraud. The mailing taking place in either June or July of 2004, and the wire taking, the wire that was alleged as of September 4th, September 7th, 2004. And basically what the evidence showed was that Mrs. Nijman contacted Lichtenberg. She had an interest in this property on Kauai that she was going to sell. And she wanted to have a lawyer to make sure that her end of it was done. And she sent, and she paid him for that. She sent him $1,800, which was his fee for doing that. She also made explicit instructions that the proceeds should be wired directly from the escrow company conducting the transaction to her bank in Louisiana. And she provided the name of the bank, the bank transfer information, her account number, and so forth, so that could happen. And she specifically prohibited Mr. Lichtenberg, who had suggested that the proceeds ought to go into his trust account, which might be a normal way for such a transaction to be conducted. But she had specifically prohibited that. And then the transaction took place. What she didn't know, and this was maybe the heart of the scheme, was that Mr. Lichtenberg prepared a letter which instructed escrow as to how to complete the transaction and said that they should transmit the proceeds to him, payable to his trust account. And the letter had a CC to the client, which the escrow officer indicated meant that she understood that the client knew about this and it was okay. Well, of course, this was directly contrary to the instructions of the client. And it was the government's theory that that letter was mailed to escrow, and that was the base of the mail fraud charge. Lichtenberg testified and said he didn't make the letter, he hand-delivered it to escrow, and evidently the jury credited his... Because he was acquitted on that. Exactly so. So then the transaction took place, and the money was Lichtenberg. He deposited it in his trust account. Directly contrary to the instructions, Ms. Hyman in Louisiana eventually became concerned, where's my money? And she called Lichtenberg, and Lichtenberg falsely reassured her in some fashion, basically saying, well, the transaction never took place, and he thought it was all over, something like that. Then she found out that it had taken place, the deed had been conveyed, the interest had been conveyed, and the money had been given to Lichtenberg, and she was out. So theft. You could call it a scheme to defraud, which it is, but it's really just a theft. And so as schemes of fraud go, at least the fabric schemes one could imagine, because there was nobody else involved. There was no basis for a conspiracy charge or anything else. So here's the gravamen of the problem with Count Two Wire Fraud. It's that the scheme was done. It's all over the money. But now the wire fraud allegedly is what? The wire fraud is three elements. No, no, I'm not asking you about what is wire fraud, the conduct that was alleged to be the wire fraud. Oh, a wiring of $100,000 from his trust account in Indonesia. In Indonesia, exactly so. But wire fraud requires a scheme to defraud, okay, no problem there. Number two, this is part one of the problem. Use of the wires in furtherance of that scheme, and then third, specific intent to deceive or defraud the victim of the scheme. So the problem is, to be in furtherance of the scheme to defraud, the wire transaction has to be somehow a step in the plot to defraud the victim. But the victim had already been defrauded. Her money had been stolen. It was reduced to Lichtenberg's exclusive control at the time the wire went. And this problem wouldn't be... But wasn't his overall objective to get the money to Indonesia? Wasn't the overall objective to get the money to Indonesia? It's all part of the scheme. Well, you say that's all part of the scheme. That's not what the jury was talking about. The jury was told about a scheme to defraud Ms. Heinemann out of the proceeds of a real estate transaction. That had been accomplished by September, before September 7th. I thought you just told us that he let her know that he wanted the money transferred to his trust account. That's right. So then the next step of it has to be he has to get it out of that trust account in some place? No, no, no. But that would be so if she had authorized him to do that. She specifically prohibited him from doing that. She said he may not put the money in your trust account. It must go directly to me. That was the government's proof. That was her testimony. That was the allegation in the indictment. So I guess my question is, since in furtherance of the scheme, it need not be the essential element of the scheme under ship C, just a step in the plot, it doesn't seem to me to be outlandish to suggest that the whole scheme is to have the money in Indonesia for him to use, not to have it in his trust account, and therefore he goes to the trust account, and then he wires it to Indonesia, which is harder to get after, and then he goes. That's not a pacifistic theory. Well, it's not the allegation of the scheme. Well, the indictment is the complaint says a series of acts to convince the victim to agree to something contrary to her wishes, get the money out of her hands and out of her reach. That's what that's going to be about. Get the money out of her hands and out of her reach once it was in his trust account. No, that's not the theory of what a trust account is, as I understand it. Not that a trust account is properly used. Of course not. It is under some circumstances. The point you're making, Judge Schroeder, I think would be well taken. If we have a lawyer who took money in his trust account in a normal transaction and then stole it, this might be a different case. But here, we know that Ms. Hyman prohibited that. So she was defrauded because he explicitly did the exact contrary of what she had instructed him to do. And, you know, this whole problem would have gone away if he had succeeded in the bail fraud or if they had alleged some other wire transaction. I mean, there's evidence of telephone calls. This is a self-inflicted wound the government suffers here if I'm right about this because they chose the way to pursue this case. And sometimes versus if one makes it like that, consequences. I guess I'm just having trouble understanding how the thing, even setting aside the point that the scheme wasn't completed until he got to Indonesia, I don't see how you can quite say that the scheme was complete. The government says it wasn't completed until he got to Indonesia, but I don't see how you can argue that it was complete when it was in this trust account. I don't think so. That's what I. Because of the Rood case, that's a scheme to defraud a victim of money. It's complete when a defendant pays the victim's money. I didn't see that. It's a decision of court. Yeah, but the trust account is a little different animal. Well, it's not any different than if he put it into some other account. It's just a question of how he spent the money. If he had taken the money in his trust account and bought a car with it, it's all the same. It's all one. Once the victim has been deprived of the money or the defense has obtained the victim's money, that's when the scheme is complete because the wire fraud is not a continuing offense. If he had sent it back to the victim the way it normally should be done, the way the trust account should be utilized, there wouldn't be a problem. She wouldn't have been defrauded. Well, she wouldn't have been lost. She would have been defrauded in the sense that her instruction provided it. Well, she has an out-of-pocket. Correct. That's true. But I think the government's analysis of this case is confounded by their view that wire fraud is a continuing offense. Now, in any event, let me move on. Now, if I'm right about Count 2, then Count 3, 4, and 5 go because those are the money laundering counts. But if I'm wrong about Count 2, still Count 3 and 4 go. 5 is still viable, but 3 and 4 are dead because you can't have money laundering until you have the proceeds of specified criminal activity. And the wire fraud doesn't take place, even under the government's view, doesn't matter until September 7th. But the money laundering counts, two of them, that is, Counts 3 and 4, probably should have taken place before September 7th. So, temporarily, you don't have the completed predicate specified criminal activity that's necessary where they have money laundering. And so, under any analysis, Counts 3 and 4 are believed to be reversed for insufficiency of evidence. That argument doesn't apply to Count 5 because Count 5 deals with a transaction transfer that took place after the September 7th wire, which is the triggering event for the completion of the offense in Count 2. And Congress has made it clear that money laundering is a separate conduct, separate offense that occurs after completion of the underlying criminal offense. So it can't take place before the underlying criminal offense. And this is, once again, the result of the unanticipated by the government equivalent of Count 1 because these counts wouldn't be inferred for insufficiency of evidence if the mail fraud charged in Count 1 had been done without consulting. But it didn't. So, I think I'll move on from that. Now, you've heard the sugar head. I thought that he just explained that the reason that he had testified that he didn't mail the letter, he had hand-delivered it. So, therefore, it wasn't mail fraud. Right. But it doesn't mean necessarily that it wasn't. Your own position is that it's in contravention of what he was supposed to do. Well, that's on the insufficiency argument. But in terms of the money laundering counts, if you reject my argument on Count 2, you still have the fact that Estacounts 3 and 4, which charge money laundering, they're charging conduct that takes place before there's a completed offense, before there's specified criminal activity. Because now, if you uphold Count 2, you have a triggering date when the specified criminal activity is complete, September 7th. But if you have a Count 3 and a Count 4, which you do, which says money laundering occurred before September 7th, you don't have the necessary completed crime, which Congress has said is what differentiates money laundering from just being a part of anything else. And that's necessarily the savage case holds. There are numerous cases hold that there's not even any significant... The money laundering specifically was which transactions? Let me see if I can refresh my recollection. Count 3 suggests that the funds purchased to travel to Jackson is being collected. And Count 4 also says the funds purchased to travel to Jackson is being collected. And those took place before September 7th. That money was from? From her. Her money. We're not quarreling about that. We're just quarreling about the question of whether you have the completed, specified other criminal activity. And the statute is specific. It can't just be some kind of fraud or some kind of theft. It has to be a gentleman here, particular federal offense of wire fraud. There are other specified things that could have been, but they're not alleged. And so that's what the statute is dealing with here. So let me turn to sentencing quickly. I want to start with the district court's what I would call mediation of the restitution between Mr. Wittenberg and the district judge. Sentencing has continued for 15 months after various hearings, and we haven't found any particular case that deals with this kind of circumstance. And so we have drawn what we think is the proper rule for decision from the Bruce case, which involved the district court's discussion with the defendant in the context of a rule of guilty. And in that case, as in this case, I think the circuit court felt that the district judge was motivated by appropriate desire in the Bruce case not to make sure that the defendant knew what he was doing and wasn't doing. And here, the district court, I don't question the district judge's motives or her desire to both see that the time to get as much money back as could be gotten, and it also, Mr. Wittenberg, might get some benefit for it. But the danger of that kind of involvement, I think, is manifest. Well, let me add, what I'm not quite clear on is if we assume that the district court got over-involved, more involved than perhaps the ethical standard of an impartial decision-maker ideal would entail, what is the remedy for that? Well, the remedy is to give the district court a chance to re-sentence in front of the district judge because there are other sentencing errors. No, but I just asked you about that. You're not trying to affect the conviction? This all happened after the PSR came in. Okay, so you want to send it back for resentencing by a different judge. Right, but this isn't the only sentencing error. What exactly did, as I understand it, what she did was make phone calls from the courtroom. Oh, she did a number of things. What did she do beyond that? Prepare a power of attorney for use. What's wrong with that? I don't think the district judge ought to be preparing a power of attorney for the defendant to authorize somebody on his behalf to go to Indonesia and get the money back. If the defendant wants to do it, he should prepare a power of attorney, or a standby counsel should do it, and the government should. And that was all with a view that a standby counsel might go to Indonesia and treat this. Was he represented? He was pro se during this whole thing? Is that correct? Yes, and he had standby counsel. He had a full-front client, if I might say. Yeah, absolutely. So she prepared this power of attorney. Yeah, so she did this power of attorney. What else did she do? Well, she repeatedly told him that the main thing influencing her sentencing was this restitution, or whether she could go above the guidelines. It's your power to make that fact, as she said. She suggested he might want to talk to the government, because the extent her loss could be mitigated, and as the victim's loss, that may well affect the argument the government is making. It may well affect what they do. She remarked that there are lots of things going on here, whether he cooperated, that may affect your sentence. But what if the money isn't there? The district court responded when the government suggested imposing the sentence before the money was retrieved. The government wasn't 100% going along with this program, but they weren't too vigorous in opposing it either. And she said that will definitely affect sentencing. I don't want a sentence without knowing that we have money in hand. The district court remarked that the money in the Indonesian account was untouchable because he made it untouchable. She told him, if you assist the government in doing this, you'll have done something favorable. My question to you is, do you want to tell us about it or not? She talked about the house in Indonesia that was occupied by his in-laws. She said, I'm actually appalled by what's going on here. You may suffer a lot more than you're expecting, but it's not your right to do this. And over numerous years, over 15 months, I think, the district court crossed a line that shouldn't be crossed. What's your strongest authority for that? We think the Bruce case, which dealt with a brutal leather case, we have found no case similar to this. So from that, all of that which you just went through, how is that manifested in the actual sentence that she imposed? Well, after all, she gave him a year less than she had indicated she was going to originally do. Which, you know, I mean, Lichtenberg himself, when the sentencing finally occurred, he said, so do I get a downward departure? So my cooperation is passed here, but he didn't do anything for me. There's no diminishment for returning the money. I presume that's a diminishment of the length of the sentence. Why is that? Returning the money didn't help my cause at all, he remarked. You're right. He had a point. So let me just touch the biggest stage that needs to be reset. Because the starting point was wrong. And it's wrong because the moment the victim and the answer was improperly applied. And it's wrong because the criminal history was improperly calculated because of the violation of catch order, which is so much of the time that she needs to explain. Okay, you're out of time. We'll give you a minute on rebuttal if you want to use it. Thank you. Good morning. May it please the Court. Counsel. I'll start with the wire fraud. Could you introduce yourself? Identify yourself. I'll start with the wire fraud conviction. The way that the standard review is employed in law is a deferential standard. So you have to look at what I mean. Reasonable, triumphatic, or fun. And in this case, for you to do so, you find this. We believe it's the case that all along, this defendant intended to defraud the victim of her money. He intended not just to violate her instructions by putting it in the client trust account, but then to make it unavailable to her by taking it out of the client trust account. And under the deferential standard, that is something that not only could one find, but the jury did find. Here we have a unique form called the special verdict form, which, if you look at it, excerpt from record 569, says that the jury did find that the standard to notify the victim that the funds were in the client trust account at the same time he made the wire transfers impacted their finding that he was guilty of the wire fraud. So in this case, what we do have is we have steps in the scheme to defraud. And one of those integral steps was the transfer of funds to the client trust account in contravention of the victim's will and wish. But the other step was making the money completely unavailable to her by wiring it out of that client trust account. So it was incident to this scheme. It was also essential to this scheme. And under the Moot case, what we think is very similar to our case, we do have a scheme that would encompass the wire fraud. I'll address the money laundering. Because if we get to that point, then I'm hearing counsels argue that that's the money laundering. Right. So as counsel correctly said, Count 5, there's no issue with Count 5. We consider this a temporal problem. Now, what we would argue, and we think the case law principle, is the finding that there is a completed phase of the scheme at the time the money is transferred to the client trust account. The issue is that you want to make sure that the defendant has possession of these funds, that he has obtained them. And that's the problem in the Johnson case. Well, under the federal statute, just let me back up a minute. Under the federal statute, money laundering has to be laundering of the proceeds of a particular kind of crime. That's correct. And so the predicate crime here for the money laundering is what? It's the wire fraud. And it is the scheme in our case to fraud. Wire fraud, meaning the, not the mail fraud, but the wire fraud, meaning the, which wire fraud? The wire fraud meaning the transaction was initiated on September 3rd and then completed on September 7th. That was what? Was that Indonesia or was that the? That's correct. That was the $100,000 that got put into the account on September 2nd, September 3rd, was then pretty much immediately transferred out to Indonesia. Now, the problem that the courts have addressed, that starts in Johnson and up through Savage, is that those are situations where the government tried to double charge. They said, okay, we've got wires, and we're going to charge you both as the wire fraud and as the money laundering. Well, the courts were concerned with that, and they said, well, no, you actually have to obtain the funds. You have to obtain the proceeds before you can actually then engage in money laundering. They have to be separate acts. And in this case, we haven't double charged. We have our scheme. We have our wire fraud. We have the use of the wires to further this very long scheme that began at least in July, you could argue maybe began in December when he falsified his passport and intended to move to Indonesia at that point. But at least it continued through September 8th, which we did adequately charge in the indictment. Was his wife in Indonesia? His wife was in Indonesia. And by virtue of the statements that he made during the course of the proceedings, he had to use that money. Well, does the wire fraud have to be complete before you can have money laundering? Well, certainly a phase of the wire fraud has to be complete. We think the case law does say that. What's the best case that supports what you just said? We can look at Morelli, which is a Seventh Circuit case. How about that? Have we addressed the issue? Well, we addressed the issue in Rogers to some extent. To some extent, what we said in Rogers is that there was a similar situation where we had two counts, mail fraud counts. One was an acquittal, and then we had one account that had been sustained. And what we said, or what was said in Rogers, is that a portion of the proceeds that is then laundered doesn't have to derive from the actual act that sustained the condition of the fraud. So that is the case that we could look to. But there are a number of cases that we have cited. Garlick is a Ninth Circuit case where it says that it's a jurisdictional issue that once the wire fraud does take place, then the scheme or the fraud is, in fact, the federal crime of wire fraud. But that doesn't preclude finding, as we already have found, that at the stage the money went into the client's trust account, there was complete evasion. Do these two counts make any difference in the overall sentence? They don't. Because what we do is we look at count five, which is sustained because of it occurring on September 8th after the wire fraud occurred. So then when you look at the $373,000 of loss, that is what motivates the guidelines. So even if the court were not to agree with our premise, the condition would still stand as to the count five. Let me change, if you could, to if my worry is the criminal history points. Criminal history points as the order of protection versus the contempt of court? In the guidelines it suggests that an exception for prior offenses that are similar to contempt of court is the exception. And as I tried to read through, while I've been on the district court and I wasn't in the federal district court, on the state district court, and I saw protection orders a little bit differently than I did contempt orders, it seems to me, nonetheless, if I review what Hawaii suggests about them, that they're pretty similar. So why isn't that an exception and, therefore, not criminal history points? Well, it is a common-sense approach. And in that case, we would argue that the order of protection does have some variations and is somewhat different because, in that case, you are seeking to protect somebody. In this case, with the contempt of court, their elements are not necessarily consistent with the order of protection elements. So we would argue that they end up with this common-sense approach that they are dissimilar. However, it seems as if the punishments guidelines provide prior sentences, what they have to do, and then I look at what we have for, if you will, the protection orders under the Hawaii law, pretty similar. What they have to do under Hawaii law in order to have these protections orders violated and what they have to do under the contempt law seem pretty similar. And it seems to me those are tough difficulties, tough comparisons to make and not come out that we should have criminal history points here. Right. Well, as to that issue, we do think that they are somewhat dissimilar. Yes. Well, what's the only thing you could say is similar, as I understand it, is one would involve the victim and the other doesn't? That's correct, Your Honor. The order of protection has a different, and that could result in the sentencing, and that could result in the imposition of what they are. Well, let's suppose they are similar and that the court made an error. Don't you believe then that the range from 63 to 78 months rather than the 70 to 87 months is enough for us, especially given that the court went above all of the sentencing guideline range based on the 3553A factors? We better send this back. Well, Your Honor, we would say that if there were a miscalculation in the guidelines of criminal history, then yes, it would have to be remanded for the correct calculation of the guidelines. We don't subscribe to the position of the defense as to the manner in which the defendant was sentenced or that the court acted with any impropriety during the course of the sentencing proceedings. So leaving aside what the court finds with respect to the counting or the computation of misdemeanors, if I could just address the arguments that were made by counsel as to what occurred during the sentencing. Well, what effect would it have? I'm not quite understanding under this new regime of sentencing if this resulted in a couple of extra points. The way the court sentenced him, the way that she put forth the 3553A factors, we'd say it wouldn't make any difference. Harmless error, yes. However, don't we have a procedural error and a substantive error? And if we don't have a correct calculation of the guidelines, then applying the 3553A factors to those guidelines makes it a little difficult. So therefore, that's why you said if you do find an error on the two criminal history points, we probably ought to send it back. Right, because I think the case law does say that if there is an error in the calculation of the guidelines. Let me ask you this. Does harmless error apply in sentencing situations? I think it does apply, definitely. And I think in this case, probably what would happen is if we go back, she could correctly, if in fact you find that it wasn't correctly, And then give the same sentence. Give the same sentence. Right. It would just be sort of an exercise in utility to some extent, but I think there were errors at the point there. Now, looking at the positional record, there were 13 hearings that occurred. And it's important to take each hearing and to take a look at it for what it was worth. The court, on September 27, 2006, came completely ready and was ready to sentence the defendant to 138 months. How was the first sentencing hearing? That was actually the second. The first one had to do with some issues that he had raised, that he had depression and such, and so he had to be next in line. And that's found not to be valid. They were going to do the ultimate sentence. But the first sentence where she considered the guidelines, where she considered his objections, and then when we were sort of off to the races was September 27, 2006. And during that period of time, she went through all the objections. She gave her ruling. She entered into a discussion with the defendant as to why she was ruling in certain ways on these guideline calculations. And then she said, I'm going to sentence you to 138 months because what I feel you have done here is not adequately reflected in the guideline calculations and extends well beyond what you should be facing. She didn't give him any alternatives. She said, this is what I'm going to sentence you to. And then after hearing a proposed sentence, if you look through that transcript, he gives another plea for a lower sentence. He says, Your Honor, don't take my life away from me. No divorce, no acceptance of responsibility, no mention of the victim. And at that point, she says, well, I'm going to tell you what's influencing my decision here. And it has to do with the fact that you have not said where the funds are, demonstrating no acceptance of responsibility. There's obstruction of the course of this proceeding. And then it was the defendant, unsolicited, who gets up and he says, well, I don't have her money, which is a lie. I don't need the money to get out of the proceeding. All I have is some money that I'm willing to give her, $200,000 in an account in Indonesia, completely unsolicited. Now, what we would say at this point, that's where he makes himself vulnerable to any kind of perjury charge, to any kind of problem that the defensement says happens throughout the proceeding. Now, at that point, she says, well, I'm going to let you talk to your standby counsel. She doesn't say, well, let's see what we can do here to mitigate some restitution issues and maybe we can help you settle your sentence. In fact, from the very beginning, she says, this may or may not affect your sentence. I don't know how this is going to happen, but all I can do at this point, prior to instituting a sentence, is give you the opportunity to cooperate and accept responsibility. That's all I can do. No, it's strange in this case because, in fact, after all of this, after 13 hearings where the defendant is saying he wants to cooperate, he's given us a little bit of information here and there, but the government then has to go and track down. He still gets 12 months off. So it's a question of where he would have ended up in any event. Any judge could have looked at the same factors that the court did look at in the November 6, 2007 hearing where she didn't close her final sentence and could still find the same factors. He actually got credit. You know, I thought it was kind of odd, maybe not odd is the right word, but somewhat different that she's calling people on the phone in the courtroom. I mean, that's kind of unusual. If you look, Your Honor, at the hearings that occurred after September 27, October 6, 2006, where she sets down the framework here. She says nothing short of having the money in hand is going to give you acceptance, responsibility, and cooperation. We trust you. I'm not just going to say that you're willing to cooperate and you say you want to cooperate. Now, it turned out to be a very complicated process to get this money. There's no treaty with Indonesia. I gathered that. They had to go on with respect. They had to talk to the banks and they had to do this in the consular's office. Correct. And then we ended up having to use diplomatic procedures. If you start at the November 20th hearing and you go to the April 5th hearing and then you go to all the subsequent hearings, you see the complexity that we're faced with. Now, the defendant at the time is saying he still wants to participate in this, he wants to get this money back, and the court is, in effect, helping him do that. With the telephone call, the defendant comes and says, well, I can't make telephone calls out of the prison. Well, fine. You can use our phone here. Now, with respect to the power of attorney, at the end of the day, it was actually the United States that drafted the authorization document. So, with respect to the power of attorney, the defendant said, I'm willing to sign it. I will sign it. I refuse it. It looks fine. No protest from the defendant. This was something he had initiated and that he was engaging in completely, knowingly, voluntarily. He's an attorney. He waived his right to testify at trial. He knew what he was getting into, and this is something that he was actually pursuing with the court voluntarily because he wanted to, if it turned out in his favor, get any credit prior to her opposing sentence because there was no mechanism for him to get any credit. Let me ask you this. Do you think that her interest in getting the money back for Mrs. Hyman was just so great that it kind of skewed her ability to make a fair decision here? I don't think at all, Your Honor. If you look at the – I mean, she let it be known how important that was to her. She did. And in the end, she only got back $200,000 or whatever it was. And he lied, and she accused him of lying and not telling the truth. Right. She did take into account some of the activities. That occurred during that period of time. Now, I would say that might be a problem if she got above the 138 months that she said she was going to get at the very beginning. At the very beginning, she said, You're getting 138 months. Now, at the end of this whole procedure, she'd give him 140 months or something and said, Now, I'm giving you that period of time because you lied in this whole proceeding. You dragged us through this, and now I'm going to punish you for that. Maybe then we'd have a problem. But his starting point was 138 months, and he ended up with 126 months. So she did, despite the fact that it was a problem getting the money for all these different reasons, give him credit for it. So it's hard to see what he's thinking his real remedy would be in this case. Any other judge, looking at the same factors that the judge did consider when she ultimately didn't post-sentence, could consider the exact same thing for the very same reasons. And so there's nothing wrong with the reasonableness of her sentence in the end. And, in fact, the fact that he did get less than she originally said he would get at the very outset sort of furnished his argument. I assume he might get more if it went back to a differential. Can I ask you a question about this protective order again? This is a hard record to work with because he was pro se, and he had advisory counsel. And at some point in the sentencing, his standby counsel filed a statement on his behalf that commented on about every sentence in the pre-sentence report. Actually, he drafted that. Yes, and he drafted it. Is the point with respect to the protective order in paragraph 63, the defendant states that two criminal history points is absurd for having a broken heart and being locked out of his home after his first trip to Bali? Excuse me. Paragraph 63. Yes, I think what the defense is arguing that all of these, there were a number of violations of the protective order, I think, up from one to ten, and then the protective courts, and then one to four. And so with the probation office, they didn't count all of them. They only counted two groups, and those two groups, they computed to each instance equal one point. So, yes, it is that paragraph 30, that paragraph 63. Apparently, there was a protective, as I gather, there was a protective order that said that he wasn't supposed to go after his wife to the house. And she locked the door, and he apparently got back in or tried to get back in. That was one set of violations, yes. And those were eight counts that went to that issue. Yes. And then there were two counts that went to a card he tried to send her on Valentine's Day. Those didn't get counted. And then there were a whole other set of counts that had to do with him coming and seeing her orders and talking to her, and then she was, they went to the court, and he was found guilty of those counts. So upwards of 12, maybe 14 different counts that happened at different points in time, three different case numbers. And then, of course, the contempt courts, the court hearings that took place as well. He was found guilty of those, and he was punished separately for those as well, although they all relate to the same order of protection. But he was always, it was always a contempt of court, correct? No, they were order of protections. So he was found guilty on two separate occasions. In the first instance, eight counts of order of protection. And then he failed to show up for some of those proceedings, and he got contempt of court charges and violations as well. So there were separate things going on in both of those different proceedings. And then there was a second set of proceedings that he had two counts of order of protection violations and then contempt of court violations that were related to that. So they were distinct. And, again, the way the probation office and the court distilled those was into two criminal history points. And it did note that there were other violations that didn't count because there were no human rights. So when the court were to consider it, she could still look at the criminal history as total, as she did, and could say that the computation doesn't count fully for how he violated the law. It could be a 3553A. Correct. Are there any further questions? Thank you. Okay, great. Thank you. Make your best shot. Well, okay. I'm going to win the whole case, except for count six. And I'm going to break it back to you. But because I don't have the statements that were set forth, number three. Number one is, this evening, Lichtenberg told Heinemann he would not convey the deed to all the proceeds of greater proceeds. Two, the plaintiff at hand has a letter. He did not send Heinemann this letter. He said the California regime was not the wishes of Heinemann. Three, Lichtenberg told Heinemann and Mr. Becker that all proceeds would be wired to Heinemann's bank in New Orleans. This was not done. Four, Heinemann did not get permission to Lichtenberg to first deposit all proceeds in Lichtenberg's land trust account. And then there's some back and forth with the clerk. I don't understand. I also don't understand. It's a disparaging thing to be doing in Hawaii and most everywhere else. And five, Lichtenberg did not notify E.H. Heinemann that the funds were in the Iowa account at the time he made wire transfers. So, the stuff of the money was complete. No wire occurred. So, we have to go in on that. I think we need to be sentenced because the starting point was wrong. I think the law is clear. If the starting point is wrong, even if the judge would get to the same place with the correct starting point, you still have to go back because it's a procedural error. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court appreciates the quality of the argument and the case you just presented. And the Court for this session stands adjourned. Thank you. Thank you for your argument. Thank you. Thank you. Thank you. You're welcome. Okay. There was one falling level that was all the way down. I didn't know if it was a touch-down. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah.
judges: Schroeder, Paez, Smith